## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

In re:

CHICAGO CENTRAL, LLC, *et al.*,[1]

              Debtors.

Chapter 11

Case No. 17-13704-SAH

Jointly Administered

### DEBTORS' EXPEDITED MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (II) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION FINANCING; (III) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO LENDER; (IV) PROVIDING NOTICE TO FILE OBJECTIONS; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF, BRIEF IN SUPPORT, NOTICE OF OPPORTUNITY FOR HEARING, <u>AND NOTICE OF HEARING</u>

**Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the effect of this document.** If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Western District of Oklahoma, 215 Dean A. McGee Ave., 9th Floor, Oklahoma City, OK 73102 no later than **Monday, September 25, 2017 at 12:00 p.m.** You should also serve a file-stamped copy of your response or objection to the undersigned movant's attorney and all others required to be served and file a certificate of service with the Court. If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice.

**A hearing will be held on this Pleading on <u>September 27, 2017 at 10:30 a.m.</u> at 215 Dean A McGee Ave, 9th Floor, Oklahoma City, OK 73102, before Judge Sarah A. Hall.**

**If necessary, the Final Hearing on any interim orders entered regarding this pleading will be held on <u>October 18, 2017, at</u>**

---

[1] The affiliated Debtors are Chicago Central, LLC (Case No. 17-13704-SAH); CC Ops - Springfield, LLC (17-13705-SAH); CC Ops - Midwest City, LLC (17-13706-SAH); CC Ops - I240, LLC (17-13707-SAH); and CC Ops - Edmond, LLC (17-13708-SAH).

**9:30 a.m.** **at 215 Dean A McGee Ave, 9th Floor, Oklahoma City,
OK  73102, before Judge Sarah A. Hall.**

Chicago Central, LLC ("*Chicago Central*"), CC Ops - Edmond, LLC ("*Edmond*"), CC Ops - I240, LLC ("*I240*"), CC Ops - Midwest City, LLC ("*MWC*"), and CC Ops - Springfield, LLC ("*Springfield*"), debtors and debtors-in-possession in the above-captioned cases (collectively, "*Debtors*"), hereby file this motion (the "*Motion*") for entry of an interim and final order (i) authorizing the Debtors to use cash collateral; (ii) authorizing the Debtors to obtain post-petition financing; (iii) granting security interests and superpriority administrative expense status to the post-petition lender; (iv) providing notice to file objections; (v) scheduling a final hearing; and (v) granting related relief. In support of this Motion, the Debtors rely on the Affidavit of William C. Liedtke, III, manager of each of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions, to be filed (the "*First Day Affidavit*"). In further support of this Motion, the Debtors respectfully represent as follows*:*

JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.[2] Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.     The statutory predicates for the relief requested herein are §§ 105, 361, 362, 363, 364, 503(b), and 507 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*).

---

[2] All references to sections or codes, unless otherwise noted, are made to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and referred to herein as the "Bankruptcy Code."

BACKGROUND

3.     On September 15, 2017 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief pursuant to chapter 11 of Bankruptcy Code in the United States Bankruptcy Court for the Western District of Oklahoma (the "*Bankruptcy Court*").

4.     The Debtors continue to operate their businesses as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  The United States Trustee has not appointed any official committees in these cases, and no request has been made for the appointment of a trustee or examiner.

5.     These cases are jointly administered pursuant to this Court's Order entered September 15, 2017 [Dkt. # 8]. A description of the Debtors' business, the reasons for filing these chapter 11 cases, and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 is set forth in the First Day Affidavit. The Debtors hereby adopt and incorporate the First Day Affidavit as if fully set forth herein.

6.     Chicago Central (directly or through its various subsidiaries, including Edmond, I240, MWC, and Springfield) operates a chain of four restaurants located in two states, and employs as many as 150 people. These restaurants are all operated under the "Old Chicago Pizza & Taproom" franchise (the "*Existing Franchise*"). Chicago Central had previously operated an additional location in Branson, Missouri, but permanently shut down Branson's operations in December 2015. Due to deterioration in the economic relationship between Chicago Central and Old Chicago Franchising LLC (the "*Franchisor*") and the inability to successfully renegotiate the franchise agreement to more feasible terms, Debtors' management has determined, in the exercise of their business judgment, that continuing operations of these franchise locations is no longer economically viable. Unsuccessful attempts to renegotiate lease terms with landlords at

the I240 and Edmond locations have also contributed to management's determination. As a result

of these and other factors, within the next six months, Debtors intend to permanently shut down

the I240 and Edmond locations and rebrand the MWC and Springfield locations as a different

franchise for continued future operations.

## RELIEF REQUESTED

7.    By this Motion, the Debtors request, *inter alia*, entry of an Interim Financing

Order (the "*Interim Financing Order*")[3] in substantially the form be submitted to the Court

herewith and a final order in substantially the form to be submitted to the Court at least five days

in advance of the final hearing on this Motion (the "*Final Financing Order*," and together with

the Interim Financing Order, the "*Financing Orders*") pursuant to §§ 105, 361, 362, 363, 364,

503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014:

> a.    authorizing the Debtors to obtain post-petition loans and other extensions of
> credit from OT Cap Partners LLC, an Oklahoma Limited Liability Company
> ("*Lender*") in an amount not to exceed $1,500,000.00 (the "*Loan
> Commitment*"), and including, without limitation, principal, other extensions
> of credit and financial accommodations, interest, fees, expenses, and other
> costs of Lender in the Case, in accordance with the terms and conditions set
> forth herein and in the attached Secured Credit Agreement (the "*Loan
> Agreement*")[4], the other Loan Documents (as defined in the Loan Agreement),
> and all other related agreements and documents (collectively, the "*Loan
> Facility*");
>
> b.    authorizing the Debtors to execute, deliver, and perform under the Loan
> Facility and Loan Documents, and all other related agreements and documents
> creating, evidencing, or securing indebtedness or obligations of the Debtors to
> Lender on account of the Loan Facility or granting or perfecting liens or
> security interests by the Debtors in favor of and for the benefit of Lender on
> account of the Loan Facility, as same now exists or may hereafter be
> amended, modified, supplemented, ratified, assumed, extended, renewed,
> restated, or replaced, and any and all of the agreements and documents

---

[3]  A copy of the proposed Interim Financing Order is attached as Exhibit 3, and incorporated
herein by reference.

[4]  A copy of the Summary of Terms is attached as Exhibit 1 and the Loan and Security
Agreement is attached as Exhibit 2, and incorporated herein by reference.

currently executed or to be executed in connection therewith or related thereto, by and among the Debtors and Lender, the terms of which are referenced and incorporated herein (collectively, the "*Loan Facility Documents*");

c.  approving the terms and conditions of the Loan Facility and the Loan Facility Documents;

d.  modifying the automatic stay of § 362 of the Bankruptcy Code (the "*Automatic Stay*") to the extent provided in the Interim Financing Order;

e.  providing notice to file objections; and

f.  scheduling a final hearing (the "*Final Hearing*") to consider entry of the Final Financing Order.

## I.    STATEMENT IN COMPLIANCE WITH BANKRUPTCY RULE 4001(B) AND (C)

In compliance with Bankruptcy Rule 4001(b) and (c), the Debtors make the following concise statement about the relief requested herein[5]:

a.  *Parties*:  The Debtors will be a borrower under the Loan Facility. Lender will be Lender under the Loan Facility.

b.  *Facility Amount*:  Not to exceed at any time the aggregate principal amount of $1,500,000 with the last $500,000 subject to advance upon specific request and the sole discretion of the Lender. [Exh. 2, Loan Agreement, § 2.1]

c.  *Termination Date*:  Earlier of the occurrence of (1) an Event of Default (as defined in the Financing Order), (2) the entry of an order confirming a Chapter 11 Plan, or (3) March 1, 2018. [Exh. 2, Loan Agreement, § 2.1 and 2.2]

d.  *Interest Rate*:  A fixed per annum rate of four percent (4.5%). [Exh. 2, Loan Agreement, § 2.3]

e.  *Collateral and Security*:

---

[5] This statement is a summary of certain terms and conditions set forth in the Loan Agreement and the Interim Financing Order. Parties in interest should review the Interim Financing Order attached hereto as Exhibit 1. Reference is made to the Loan Agreement and the Interim Financing Order for a full and complete description of the Loan Facility. To the extent this statement is inconsistent with the Loan Agreement and/or the Interim Financing Order, the Loan Agreement and the Interim Financing Order shall control. Capitalized terms not otherwise defined in this statement shall be given the meaning ascribed to them in the body of the Motion.

    i. Lender will be granted first priority liens and security interests in the Midwest City capital lease and second priority claims, liens, and security interests in any and all other assets and properties of the Debtors, now owned or after acquired, real and personal, and the proceeds and products thereof (collectively, the "*Collateral*"), to secure the Loan Facility, junior to all other liens and security interests pursuant to the terms of the Interim Financing Order, to secure all obligations under the Loan Facility (the "*Loan Obligations*") (and including, without limitation, principal and any other extensions of credit, interest, fees, expenses, and any fees and expenses of Lender in the Case, however incurred), but subject only to Prior Liens (if any) and the Carve-Out (as defined below). The Collateral does not include any causes of action under Bankruptcy Code §§ 544, 547, and 548. [Exh. 1, Interim Financing Order, ¶¶ 18-19]

    ii. Lender will be granted superpriority administrative claims and all other benefits and protections allowable under Bankruptcy Code §§ 507(a)(2) and 503(b)(1), senior in right to all other administrative claims against the Debtors, except for the Carve-Out. [Exh. 1, Interim Financing Order, ¶ 20]

f. *Event of Default/Termination*:   A customary term for this type of credit facility. [Exh. 2, Loan Agreement, § 7.1]

g. *Purpose for and Duration of Loan Facility*:

    i. To maintain the Debtors' assets, operate their business, provide financial information, and pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors and to file and obtain confirmation of a plan.

    ii. Lender's consent commitment to provide credit under the Loan Agreement and the Interim Financing Order, subject to the funding limitations therein, will be effective upon entry of the Interim Financing Order to and including the earlier of: (a) notice of the occurrence of an Event of Default or (b) the date of the Final Hearing unless otherwise extended by agreement of the Debtor and the Lender, at which time all of the Debtors' authority to obtain credit under the Loan Agreement and the Interim Financing Order will terminate, as will Lender's obligation to continue funding the Loan Facility, unless extended by written agreement of the parties hereto.

h. *Carve-Out*:

    i. Lender consents, subject to the terms and conditions set forth in the Interim Financing Order, to a carve out from its Collateral for the payment of (i) reasonable fees and expenses approved by the Court

pursuant to § 330 of all professionals hired by the Debtors or who otherwise seek to be paid by the Debtors as a part of this case (the "*Case Professionals*") (ii) an aggregate amount not to exceed $30,000.00 to be used to pay fees earned and expenses by counsel for the Committee (if any) (collectively, the "*Carve-Out*").

i.   *No Surcharge; Marshaling Waiver; Release of Claims; Indemnity*:

  i.   No costs or expenses of administration will be charged against Lender, its claims or the Collateral pursuant to Bankruptcy Code § 506(c) without the prior written consent of Lender. Lender will not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

j.   *Other Material Terms*:

  i.   Upon the occurrence of any Event of Default and without limitation to the other remedies set forth in the Financing Order, and, failure to pay within five (5) days (as to monetary payment defaults) and after the giving of thirty (30) days' notice (for non-monetary defaults) by Lender, then without further act or action by Lender, or any further notice, hearing or order of this Court, the Automatic Stay will be immediately modified and Lender will be authorized, in its sole and absolute discretion, to take any and all actions and remedies that Lender may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of the Debtors..

  ii.   Lender will be provided access to information to the extent provided in the Interim Financing Order.

## II.   THE DEBTORS' SECURED DEBT

8.   The Debtors have pre-petition secured debts to (1) a group of affiliated lenders[6] led by Praesidian Capital Opportunity Fund III, LP, a Delaware limited partnership, in its individual lender capacity and its capacity as agent (collectively referred to as "*Praesidian*"), and (2) Cinghiale, LLC ("*Cinghiale*"), as successor to JPMorgan Chase Bank, N.A. ("*Chase*").

9.   Fund III, through wholly-owned subsidiary PCOF III Corp., owns warrants by

---

[6] The Praesidian group consists of (i) PCOF III RI Corp., a Delaware corporation ("*PCOF III Corp.*"), (2) PCOF III-A RI Corp., a Delaware corporation ("*PCOF III-A Corp.*"), (iii) Praesidian Capital Opportunity Fund III, LP, a Delaware limited partnership ("*Fund III*"), and (iv) Praesidian Capital Opportunity Fund III-A, LP, a Delaware limited partnership ("*Fund III-A*"), as lender.

which it may acquire 36.7535% of the equity in the parent company of Chicago Central, and Fund III-A, through wholly-owned subsidiary PCOF III-A, owns warrants by which it may acquire 14.2465% of the equity in the parent company of Chicago Central. Debtors' secured obligations to Praesidian are set forth in certain documents executed and delivered to Praesidian as a secured creditor by the Debtors and a number of other non-debtor affiliates (the "*Praesidian Credit Agreement*").

10.     The Praesidian Credit Agreement and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, warrant agreements and other instruments or documents executed in connection therewith or related thereto are referred to herein collectively as the "*Praesidian Pre-Petition Claim Documents*." Pursuant to the Praesidian Pre-Petition Claim Documents and applicable law, Secured Creditor holds a valid, enforceable, and allowable claim against the Debtors and a number of other non-debtor affiliates, as of the Petition Date, in an aggregate amount of at least $20,800,000 of unpaid principal, plus any and all accrued and unpaid interest, fees, costs, expenses, charges, and other claims, debts or obligations of the Debtors to Praesidian that have accrued as of the Petition Date under the Praesidian Pre-Petition Claim Documents and applicable law. The Praesidian claim as described in the preceding sentence together with all Post-Petition Date interest, fees, costs, and charges allowed to the Secured Creditor on such claim pursuant to Bankruptcy Code § 506(b) shall collectively be referred to hereunder as the "*Praesidian Pre-Petition Claim*."

11.     Chicago Central and Springfield are liable to Cinghiale as successor to Chase. In October 2012, Chase, as lender, and Utana Usquoli Tsunaligohi LLC ("*UUT*"), a third party as borrower, entered into a loan agreement (the "*UUT Loan*"). The UUT Loan expressly provided that a portion of the UUT loan could be used by Springfield in its business, in exchange for

certain guarantees of the UUT obligation to Chase by both Springfield and Chicago Central, secured by a Deed of Trust in favor of Chase on real property owned by Springfield. Pre-petition, Cinghiale acquired all of the right, title, and interest of Chase in the UUT loan and now holds 100% of the interest therein (the "*Cinghiale Credit Agreement*"). The Cinghiale Credit Agreement and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto are referred to herein collectively as the "*Cinghiale Pre-Petition Claim Documents*." Pursuant to the Cinghiale Pre-Petition Claim Documents and applicable law, Cinghiale holds a valid, enforceable, and allowable claim against Chicago Central and Springfield as of the Petition Date, in an aggregate amount of at least $410,000 of unpaid principal, plus any and all accrued and unpaid interest, fees, costs, expenses, charges, and other claims, debts or obligations of Chicago Central and Springfield to Cinghiale that have accrued as of the Petition Date under the Cinghiale Pre-Petition Claim Documents and applicable law. The Praesidian Pre-Petition Claim and the Cinghiale Pre-Petition Claim are collectively, the "*Secured Creditor Pre-Petition Claims*." Praesidian and Cinghiale are collectively, the "*Secured Creditors*."

12.    The Secured Creditor Pre-Petition Claims constitute an allowed, legal, valid, binding, enforceable, and non-avoidable obligation of and claim against the Debtors, and is not subject to any offset, defense, counterclaim, avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess and cannot assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, allowance, and non-avoidability of Secured Creditor Pre-Petition Claims.

13.     Subject only to Prior Liens (if any), and with the exception of two capital leases, the Praesidian Pre-Petition Claim is secured by properly perfected first priority liens and security interests in, *inter alia*, any and all non-real property assets and personal property of the Debtors, now owned or hereafter acquired and the proceeds and products thereof. The Cinghiale Pre-Petition Claim is secured by a first priority real estate mortgage upon the capital lease held by Springfield (collectively and to be defined in the Interim Financing Order, the "*Pre-Petition Collateral*"). The debts to the Secured Creditor are collectively referred to as the "*Secured Claims*."

14.     Additionally, all cash of the Debtors' bankruptcy estates, wherever located, and all cash equivalents, whether in the form of negotiable instruments, documents of title, securities, deposit accounts, investment accounts, or in any other form, that were on the Petition Date in any of the Debtors' possession, custody or control (or persons in privity with any of the Debtors), or in which the Debtors will obtain an interest during the pendency of the Case whether via advances under the Loan Facility or otherwise, or which represent income, proceeds, products, rents, or profits of any of the Collateral is the cash collateral of Praesidian (collectively, the "*Cash Collateral*"). Praesidian has a first priority perfected lien and security interest in the Cash Collateral pursuant to the applicable provisions of the Pre-Petition Claim Documents and Bankruptcy Code §§ 363(a) and 552(b) and has consented to the use of its Cash Collateral pending the grant of this Motion.

15.     The Secured Creditors have agreed to subordinate all of the Secured Creditor Pre-Petition Claims and all of their rights in the Cash Collateral, but only to such property and no other, to the claims and liens granted to Lender in the Loan Agreement and the Interim and Final

Financing Orders. To the extent necessary, the Secured Creditors consent to the use of any cash collateral.

16.     The security interests and liens of Lender granted pursuant to the terms of this Interim Financing Order are subject and subordinate to any other valid, perfected and unavoidable liens and security interests of any other secured creditor in any assets of any of the Debtors existing on the Petition Date that are senior in priority under applicable law to Lender's liens and security interests granted under the Pre-Petition Claim Documents in the Pre-Petition Collateral (collectively, the "*Prior Liens*").  Ecolab (the "*Equipment Lessor*") has given notice of a purported security interest by the filing of several UCC-1 financing statements (the "*Notice Liens*") in all equipment, all accounts receivable, and all general intangibles (the "*General Assets*") that are beyond the specific equipment, goods, and related property that is the subject of the Equipment Leases (the "*Specific Assets*"). However, the contracts between the Debtors and the Equipment Lessors do not grant any liens upon the General Assets and therefore, except for the purchase money security interests in the Specific Assets created by the Equipment Leases, the Equipment Lessors do not hold any Prior Liens on any of the General Assets. To avoid any ambiguity, the liens granted to the Lender shall be subordinate to the Prior Liens created by the Equipment Leases on the Specific Assets. The Debtors or any other party in interest, including Lender, shall have the right to object to the validity, priority, or extent of any such Prior Liens, or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto. The post-petition liens granted to Lender pursuant to this Interim Financing Order shall not at any time be (a) made subject or subordinated to, or made *pari passu* with, any other lien or security interest existing on the Petition Date, or any claim, lien, or security interest created under Bankruptcy Code §§ 363 or 364(d) or otherwise (except with respect to any Prior

Liens), or (b) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors under Bankruptcy Code § 551.

17.     Except for the Notice Liens, the security interests and liens of Secured Creditors do not have priority over any Prior Liens. The Debtors and Secured Creditors reserve the right to object to the validity, priority, or extent of any asserted Prior Lien, or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto. As of the filing of this Motion, Debtors and Secured Creditors are not aware of any Prior Liens.

## III.    NECESSITY FOR THE LOAN FACILITY

18.     The Debtors do not have sufficient available sources of working capital or cash to continue the operation of their business in this Chapter 11 case without access to the Loan Facility on an interim and final basis. In addition, the Debtors do not have sufficient available sources of working capital or cash to pay for the rebranding of the MWC location without access to the Loan Facility on a final basis. The ability to obtain sufficient working capital and liquidity through the Loan Facility is vital to the preservation and maximization of the value of the Debtors' assets and to successfully adjust the Debtors' debts.

19.     By this Motion, the Debtors request that this Court enter an order authorizing the Debtors to enter into the Loan Facility with Lender pursuant to Bankruptcy Code §§ 361, 362 and 364 on an interim and final basis.

20.     The Debtors need additional financing due to fluctuations in cash flow that are typical in their business and industry. The Loan Facility is necessary to the operations of the Debtors in this case; accordingly, the Loan Facility sought in this Motion is in the best interests of the Debtors and the creditors in this case. The proposed Loan Facility will on an interim basis fund a portion of the necessary restructuring costs and other essential costs as the Debtors move

toward confirmation of their plans. These costs include, *inter alia*, the Debtors' operating expenses, professional fees, insurance, taxes, and other miscellaneous costs.

21.     The Debtors are without adequate funds, absent access to the Loan Facility on an interim basis, with which to operate their businesses. The Loan Facility is vital to avoid immediate and irreparable harm to the Debtors' estates and businesses. The Debtors thus request emergency, interim authorization to use the Loan Facility on the basis as set forth in the Budget[7], in an amount not to exceed $200,000, prior to the Final Hearing. The expenses listed on the Budget are reasonable and necessary business expenses that must be paid in order to continue the Debtors' businesses. Because the Debtors' request for interim authorization seeks the use of only that amount of the Loan Facility as is necessary to avoid immediate and irreparable harm to their estates pending Final Hearing, this request complies with Bankruptcy Rule 4001.

22.     The Debtors propose and seek through this Motion that upon entry of the Final Financing Order authorizing use of the Loan Facility, the Debtors may continue to use the Loan Facility as set forth in the Budget for the subsequent time periods reflected in the Budget or any substitute budget, pursuant to the Loan and the Financing Orders.

## IV.     THE LOAN FACILITY SATISFIES THE REQUIREMENTS OF BANKRUPTCY CODE § 364

23.     As a result of, among other things, the Debtors' financial condition and pre-petition capital structure and the state of credit markets in general, the Debtors have been unable to obtain other sources[8] of cash or credit in the form of unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense pursuant to Bankruptcy Code §§ 364(a) or (b). Financing on an interim post-petition basis is not otherwise available without

---

[7] The Budget will be filed of record at least 5 days prior to the interim hearing.
[8] The Debtors sought financing from Spirit Bank and Chase Bank.

the Debtors' granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), and securing such indebtedness and obligations with the security interests in and the liens upon the property described below pursuant to Bankruptcy Code § 364(c).

24.     The terms of the Loan Facility discussed below are fair and reasonable under the circumstances, reflect the exercise of prudent business judgment by the Debtors consistent with their duties as Debtors, and are supported by reasonably equivalent value and fair consideration. The Debtors believe that the Loan Facility will give them the necessary liquidity they need to operate their businesses while pursuing confirmation of a plan of adjustment in order to maximize the value of their businesses and continue providing quality food service to the various communities where their restaurants operate. The Loan Facility will minimize disruption of the businesses and operations of the Debtors and permit the Debtors to meet payroll and other operating expenses, obtain needed supplies, and maintain the going concern value of their businesses by demonstrating an ability to maintain normal operations. The Loan Facility should be approved under Bankruptcy Code § 364 because "the credit acquired is of significant benefit to the [Debtors] and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the Debtors to obtain comparable credit elsewhere." *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991). The Debtors submit that they have met the requirements under Bankruptcy Code § 364 to obtain post-petition financing and that the Motion should be granted.

25.     The Debtors propose and seek through this Motion that upon entry of the Interim Financing Order authorizing use of the Loan Facility, the Debtors may use the Loan Facility as set forth therein pursuant to the Loan Agreement and the Interim Financing Order.

## V.    IMMEDIATE NEED FOR USE OF CASH COLLATERAL

26.    Bankruptcy Code § 363(c) provides, in relevant part:

(c)    (1)    If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2)    The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless –

(A)    each entity that has an interest in such cash collateral consents; or

(B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. §§ 363(c)(1), (2).

27.    The Secured Creditors have agreed to subordinate all of the Secured Creditor Pre-Petition Claims as to the Cash Collateral and, to the extent necessary, the Secured Creditors also consent to the use of any cash collateral.

28.    Debtors have an immediate need to use Cash Collateral and the proceeds of the Loan Facility to continue the operation of its business. Without the use of Cash Collateral and the proceeds of the Loan Facility, the Debtors will not have the funds necessary to conduct its business, maintain its assets, sell or otherwise liquidate its assets, provide financial information, and pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' estates.

29.    The Debtors request interim authorization to use Cash Collateral and the proceeds of the Loan Facility as set forth in the Budget until the Final Financing Order granting further use of Cash Collateral and the Loan Facility can be entered. The Budget itemizes the weekly uses

of cash and list of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtors' business until such time as the Final Hearing on this Motion can be held.

30.    The Debtors are without sufficient funds, other than Cash Collateral and the proceeds of the Loan Facility, to operate for fifteen or more days until the Final Hearing on this Motion can be held. The Debtors' inability to timely pay the costs and expenses set forth herein will result in immediate and irreparable harm to its assets. Because the Debtors' request for interim authorization seeks the use of only that amount of Cash Collateral as and the proceeds of the Loan Facility is necessary to avoid immediate and irreparable harm to the value of its assets pending the Final Hearing, its request complies with Rules 4001(b)(2) of the Bankruptcy Rules.

31.    The Debtors also request that the Court authorize it to continue to use Cash Collateral and the proceeds of the Loan Facility as set forth in the Budget or any substitute budget after the Final Hearing on the Motion.

NOTICE

Notice of this pleading has been provided by e-mail, facsimile, or overnight delivery to: (i) the Office of the United States Trustee; (ii) Praesidian Capital Opportunity Fund III, LP and Praesidian Capital Opportunity Fund III-A, LP, care of Founder and Managing Partner Jason D. Drattell ("*Praesidian*"); (iii) Cinghiale, LLC ("*Cinghiale*") and Utana Usquoli Tsunaligohi LLC ("*UUT*"), care of Chief Executive Officer Robert J. Mogelnicki (Praesidian, Cinghiale, and UUT, collectively as "*Secured Lenders*"); (iv) Old Chicago Franchising LLC, care of General Counsel Rebecca L. Fischer, Esq. ("*Franchisor*"); (v) Debtors' landlords listed on Schedule G; and (vi) the twenty largest unsecured creditors for each of the Debtors.

CONCLUSION

The Debtors respectfully request that the Court enter the Interim and Final Financing Orders (i) approving the terms of the Loan Facility on an interim and final basis, and (ii) approving the use of Cash Collateral and the proceeds of the Loan Facility, (iii) granting any and other such further relief to which the Debtors may be justly entitled.

Respectfully submitted,

**CROWE & DUNLEVY, P.C.**

*/s/ Mark A. Craige*
Mark A. Craige, OBA No. 1992
Michael. R. Pacewicz, OBA No. 18794
500 Kennedy Building
321 South Boston Avenue
Tulsa, Oklahoma 74103-3313
Telephone: 918.592.9800
Facsimile: 918.592.9801
mark.craige@crowedunlevy.com
michael.pacewicz@crowedunlevy.com

-and-

Lysbeth L. George, OBA No. 30562
Braniff Building
324 North Robinson Avenue, Suite 100
Oklahoma City, Oklahoma 73102
Telephone: 405.235.7700
Facsimile: 405.272.5203
lysbeth.george@crowedunlevy.com

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**